369 A.2d 839

**Bernard TOMASHEFSKI, Appellant,**

v.

**Joanne TOMASHEFSKI.**

Superior Court of Pennsylvania.

Argued Dec. 12, 1975.

Decided Nov. 22, 1976.

Robert B. Elion, Williamsport, for appellant.

No appearance entered nor brief submitted for appellee.

Before WATKINS, President Judge, and JACOBS, HOFFMAN, CERCONE, PRICE, VAN der VOORT and SPAETH, JJ.

JACOBS, Judge:

This appeal raises the question of when a petitioner can be considered unable to pay the costs of his divorce for purposes of proceeding in forma pauperis. Because we find the lower court did not abuse its discretion in determining that the petitioner-appellant in the present case was financially able to pay the costs of his divorce, we affirm.

Petitioner, Bernard Tomashefski, filed a petition with the lower court for leave to bring an action in divorce in forma pauperis, i. e. without payment of costs and fees. As is its policy in reviewing such petitions, the lower court held a hearing to determine the veracity of petitioner's allegations of indigency. The testimony at the first hearing was not transcribed due to petitioner's failure to request a transcription, and therefore a second hearing was held at petitioner's request and the testimony transcribed. At the conclusion of the second hearing, the lower court judge found Mr. Tomashefski able to pay $200 toward the cost of his divorce, to be paid at $25 a month beginning two months from the date of the hearing.[1] The order indicated that $200 was the maximum that Mr. Tomashefski would have to advance for his divorce and if the fees and costs were less than that amount the excess would be refunded to the petitioner. If the expenses were greater than that amount, petitioner would, of course, be relieved of any obligation to satisfy them.

In his petition, Mr. Tomashefski indicated that his wife had left him in November 1973, he did not know her whereabouts or financial condition, that he was regularly employed at a job he had always held and at the time of the petition he lived with three children aged six, four and three. He alleged that his total income for the past

---

1. The court in its order noted that the costs would include master's and stenographer's fees and sheriff's and prothonotary's costs plus any miscellaneous items.

year was a net of $7,262.00 after taxes and other deductions were made, or about $605.00 a month.[2] According to the figures in the petition, his monthly expenses total between $483 and $508 including monthly installment payments of $98 on loans. Deducting his alleged expenses from his stated income, it seems that petitioner should be clearing $97 to $122 each month. In addition, the petition lists other loans which do not appear to be included in the installment payments totaling $520 for such things as a new refrigerator, new furniture and Christmas gifts.

At his hearing, the petitioner testified to a fluctuating income which we have computed to average $361.04 a month take home pay.[3] He also testified to receiving $96.00 every two weeks from welfare, which he asserts in his brief is not really a fortnightly payment but a semimonthly receipt totaling $192 a month. Assuming these figures are accurate, we reach a total of $553.04 income after taxes and deductions a month, or $6,636.48 a year. This income was apparently expected to increase shortly after the hearing as petitioner testified that he was soon to begin working five and one half days as opposed to simply five days a week. His expenses, including an anticipated increase in his rent, totaled $495 a month.[4] To these expenses we will add $32 for transpor-

2. In another place on the form petition, petitioner alleged a weekly take home income of $150.00: $60.00 a week from DPA and $90.00 a week from his employment.

3. This figure is based on petitioner's testimony that he earns $78 a week during the year and between $96 and $101 during the summer. We have averaged his summer earnings at $98.50 weekly for 13 weeks and combined that total with 39 weeks of earning $78 a week.

4. We arrive at this figure by taking all petitioner's alleged expenses at the figure he set except for food: $70 for rent (includes anticipated increase), $30 for gas (averaged), $15 for electricity, $130 for babysitters, $98 for loan repayments. Food was computed at $152, or $35 a week. Although petitioner testified, "Food varies about $28–$30 a week but then I am running back for more groceries. I would have to say about $45," the lower court found this an excessive estimation, and reduced the amount to

tation monthly which is the amount claimed in the petition, as that expense was not testified to at the hearing. The result is $527 of expenses a month, leaving petitioner with at least an additional $26.04 a month unaccounted for. Petitioner also testified that his household consisted of not three but two children, aged three and four, and in discussing his loans did not mention the $520 alleged in the petition in addition to his $98 monthly installment payments. The failure to allege these additional loans could mean, and apparently was taken by the lower court to mean, that they were satisfied between the time of the petition and the hearing.

It is important to note at this point that petitioner's take-home income, whether it is closer to $7,262 as alleged in the petition, or $6,636.48 as alleged in the hearing, is not reduced by medical or legal expenses, or by costs of day care for his children which is provided free of charge by the Headstart program along with two free meals a day. Furthermore, the figures set out above represent a decision to favor the petitioner whenever a doubt arose. Thus, the income figure does not include a probable raise in pay when petitioner begins to work an extra half day, whereas the expense figure does include an anticipated increase in living costs while not reflecting a probable decrease when the second child enrolls in Headstart. Even adopting this approach in analyzing petitioner's finances, however, he still has a surplus at the end of the month. In addition, the hearing judge, who not only reviewed the petition but had the opportunity to observe and question petitioner at two hearings, expressed his doubt concerning the reliability of the fig-

$35 a week. We feel that the petitioner would agree that the lower figure represents a more accurate figure, which in fact he seems to have done in his supplemental brief. Our decision to use the lower figure is based on the fact that petitioner claimed only $30 for food for himself and three children in his written petition a mere six months previously; at the time of the hearing he claimed only two children aged three and four in his household; one child attends Headstart where she receives two free meals a day; and the other will soon begin the program.

ures which petitioner presented to the court. Due to the unexplained discrepancies in petitioner's varying representations of his financial condition, we believe the lower court was amply justified in concluding that petitioner's method of arriving at his figures was less than accurate and that the whole financial picture which he presented to the court was therefore suspect.

Pa.R.C.P. 1137 governs the right of an indigent party to proceed with a divorce without full payment of costs: "Prior to the commencement of the action, or at any time during its pendency, upon petition of a party averring his inability to pay all or part of the costs of the action, the court, upon being satisfied of the truth of the averments of the petition, shall enter an order permitting him to proceed upon payment of only those costs which the court finds he is able to pay. Costs include masters' fees and stenographic charges. The petition must disclose his full financial condition including his income and property." The rule was adopted in response to the opinion of the United States Supreme Court in *Boddie v. Connecticut*, 401 U.S. 371, 91 S.Ct. 780, 28 L.Ed.2d 113 (1971) which pronounced the due process requirement that the states make available a procedure by which individuals who are unable to pay may nevertheless have access to the courts in order to obtain a divorce. *Whitehead v. Whitehead*, 224 Pa.Super. 303, 307 A.2d 371 (1973).

In making its finding the Supreme Court was careful to stress that the due process right it outlined did not give free access to the courts without inquiry into the circumstances of each case. "In concluding that the Due Process Clause of the Fourteenth Amendment requires that these appellants be afforded an opportunity to go into court to obtain a divorce, we wish to re-emphasize that we go no further than necessary to dispose of the case before us, a case where the bona fides of both appellants' indigency and desire for divorce are here beyond

dispute." *Boddie v. Connecticut,* supra, 401 U.S. at 382, 91 S.Ct. at 788. Rule 1137 provides that the court must satisfy itself of the truth of the averment of inability to pay made in the petition before ordering that the petitioner may proceed by paying reduced costs or no costs. When a question has arisen under this rule in the past, this Court has referred the matter of determining the veracity of the petitioner's allegations to the lower court. *See Whitehead v. Whitehead,* supra; *Wilson v. Wilson,* 218 Pa.Super. 344, 280 A.2d 665 (1971).

Petitioner relies heavily on *Gerlitzki v. Feldser,* 226 Pa.Super. 142, 307 A.2d 307 (1973) in which this Court stated, "The question put by the Act of June 16, 1836 [P.L. 715, § 28, 5 P.S. § 72] is not whether petitioners are unable to pay the costs but whether they are in poverty. If they are in poverty, it follows that they are unable to pay the costs, and their petition should be granted. The Act, moreover, is to be read not with an accountant's but a housewife's eyes. 'Poverty' does not refer solely to a petitioner's 'net worth' but to whether he is able to obtain the necessities of life. Where, as here, petitioners allege that they have no income except public assistance benefits, and that their net worth is minimal, it appears *prima facie* that they are in poverty." *Id.* at 144–45, 307 A.2d at 308. There are, however, some notable distinctions between that case and the one at bar. In the first instance, the court in *Gerlitzki* was interpreting the Act of 1836 which deals with inability to pay the costs of an appeal from arbitration, not Rule 1137. Whatever the dispute in *Gerlitzki* regarding the interpretation of the qualifying phrase "by reason of poverty" which appears on the Act of 1836, it is clear in the present case that the question upon which we must focus, as it is posed by the rule, is the party's "inability to pay all or part of the costs of the action." Furthermore, the petitioners in *Gerlitzki* were shown to have no income except welfare benefits whereas the petitioner at bar re-

ceives welfare only as a supplement to an income he is earning for himself. Finally, in *Gerlitzki* the judge failed to conduct a hearing, reaching his decision by merely considering the petition, and therefore had no basis for suspecting the truth of the allegations contained therein. Here, the judge observed the petitioner and reviewed his allegations of financial insufficiency at two hearings before determining that the petitioner did not present a full and accurate account of his financial affairs. Despite the finding that petitioner's testimony was conflicting and inexact and therefore to be received with some skepticism, the lower court attempted to sketch an outline of petitioner's financial picture. It is not surprising considering petitioner's apparent lack of concern for accuracy that the hearing judge, the author of this opinion, the dissent, and indeed petitioner himself, arrive at widely differing results in separately attempting to reconcile petitioner's figures. This tends to support the court's finding that petitioner's allegations lack credibility.

 The standard set by the rule permitting a party to proceed without full payment of costs is proof of inability to pay. Mere receipt of supplemental public assistance does not mean that an individual is unable to meet the costs of his legal action. Although proof of financial need is necessary to qualify for public assistance, it would constitute an unrealistically pessimistic assessment of the welfare program to assume that the need persisted even after public funds were made available. The present case provides a good example of a situation where a family, with the help of some welfare assistance to supplement a small income, does make enough to afford the necessities of life and still have some money left over. Such a circumstance does not constitute inability to pay.

 Petitioner's allegation that he had no money with which to pay for his divorce is clearly refuted by his own

evidence which demonstrates that after deducting necessary expenses from income he is in possession of extra money from which he could afford $25 a month toward the expenses of his legal proceeding and is further undermined by the lower court's finding regarding credibility.

The order of the lower court is affirmed.

SPAETH, J., concurs in the result.

HOFFMAN, J., files a dissenting opinion.

HOFFMAN, Judge, dissenting:

Appellant contends that the court below should have granted appellant's petition for leave to proceed in divorce without payment of fees and costs.

Susquehanna Legal Services represents appellant in these proceedings without compensation because appellant receives welfare assistance and, therefore, automatically qualifies as indigent. On August 13, 1974, appellant's affidavit reflected the following income and assets: assorted household furnishings, a 1967 Ford Mustang automobile, no real property, $90 per week from employment, and a supplementary grant of $120 every two weeks from the Department of Public Welfare under the Aid to Families with Dependent Children program. Appellant's affidavit recited the following expenses and obligations: rent, $60 per month; utilities, $33 to $48 per month; food, $30 per week; clothing, $10 to $20 per month; transportation expenses, $8 per week; babysitting, $30 per week; loan payments, $98 per month (on a balance of $2,353); and miscellaneous bills due, $520 total. Appellant filed his complaint in divorce, application to proceed *in forma pauperis,* and affidavit of income and expenses on September 30, 1974. On January 9, 1975, the court held a hearing on the application.

The Court of Common Pleas of Montour County holds hearings on all applications to proceed *in forma pauperis,* but does not customarily take notes of testimony.

After the first hearing, the court found that appellant was not indigent within the meaning of Rule 1137, Pa.R. C.P., and ordered that appellant pay $200 toward the costs of the divorce proceedings at the rate of $10 per week. At appellant's request, the court held a second hearing to permit the transcription of testimony. The second hearing was held on February 27, 1975, and the following facts were adduced: that appellant supported two young children who were in his custody, that he paid $60 per month for rent, that he would soon be paying $70 per month for rent; that he paid $55 per month for utilities; that his present take-home pay was $78 per week; that he received a public assistance supplementary grant of $96 every two weeks; that his income fluctuated seasonally to as much as $101 per week; that appellant paid $30 per week for a babysitter; that food cost $45 per week; that he owed $300 for taxes in 1974; and that all other expenses and income in the previous affidavit were re-affirmed. Further, appellant testified that he was unable to afford to buy clothing for the children. At the conclusion of this hearing, the court again held that appellant was not indigent, but ordered that the costs of $200 be paid at the rate of $25 per month. This appeal followed:

Rule 1137, Pa.R.C.P., provides:

"(a) Prior to the commencement of the action, or at any time during its pendency, upon petition of a party averring his inability to pay all or part of the costs of the action, the court, upon being satisfied of the truth of the averments of the petition, shall enter an order permitting him to proceed upon payment of only those costs which the court finds he is able to pay. Costs include masters' fees and stenographic charges. The petition must disclose his full financial condition including his income and property. No filing fee shall be required for the filing of the petition.

"(b) A petition by a plaintiff shall also include a statement of the financial condition of the defendant in-

cluding income and property, to the extent known to the plaintiff. The petition shall not be denied or delayed because of defendant's financial ability to pay the costs. The entry of an order relieving the plaintiff from costs of the action, in whole or in part, shall not relieve the defendant from any liability for payment of the costs of the action.

"(c) If the plaintiff has been relieved of the payment of all or part of the costs the court by general Rule or special order may provide the procedure by which the defendant may be required to pay such costs. Such proceedings shall in no manner delay or interfere with the disposition of the plaintiff's action."

Rule 1137 implements the United States Supreme Court decision in *Boddie v. Connecticut,* 401 U.S. 371, 91 S.Ct. 780, 28 L.Ed.2d 113 (1971), which held that a state may not deny access to its divorce courts because of the plaintiff's inability to pay the costs of the proceedings. See *Schoepple v. Schoepple,* 239 Pa.Super. 557, 361 A.2d 665 (1976).

In *Gerlitzki v. Feldser,* 226 Pa.Super. 142, 307 A.2d 307 (1973), our Court interpreted a statute [1] authorizing appeals *in forma pauperis* from arbitrators' awards if the appealing party is unable to pay the costs of the suit "by reason of poverty." We held that: "[t]he Act, moreover, is to be read not with an accountant's but a housewife's eyes. 'Poverty' does not refer solely to a petitioner's 'net worth' but to whether he is able to obtain the necessities of life. Where, as here, petitioners allege that they have no income except public assistance benefits, and that their net worth is minimal, it appears *prima facie* that they are in poverty." 226 Pa.Super. at 144–145, 307 A.2d at 308.

---

1. Act of June 16, 1836, P.L. 715, § 28, 5 P.S. § 72.

In *Schoepple v. Schoepple,* supra, 239 Pa.Super. at 562, 361 A.2d at 668,[2] the lead opinion by Judge Spaeth noted that, "a distinction is to be drawn between the condition of 'poverty' (called for by the Act of 1836) and the condition of 'inability to pay all or part of the costs' (called for by Rule 1137). Of these two conditions, that of poverty is the more inclusive: one in poverty will not be able to pay costs; one not able to pay costs might not be in poverty (it would depend on the amount of the costs)." Thus, for the purposes of Rule 1137, the hearing judge must weigh the costs of the proceedings in the light of the litigant's available resources. Further, *Schoepple,* interpreting Rule 1137, adopted the reasoning of *Gerlitzki,* interpreting the Act of 1836, that a petitioner who receives public assistance is *prima facie* unable to pay costs and, thus, eligible to proceed *in forma pauperis.*

Appellant in the instant case receives a partial grant from state and federal funds under the Aid to Families with Dependent Children program (AFDC). "The AFDC program is one of three major categorical public assistance programs established by the Social Security Act of 1935. See U.S. Advisory Commission Report on Intergovernmental Relations, Statutory and Administrative Controls Associated with Federal Grants for Public Assistance 5–7 (1964) . . . The category singled out for welfare assistance by AFDC is the 'dependent child,' who is defined in § 406 of the Act, 49 Stat. 629, as amended, 42 U.S.C. § 606(a) (1964 ed., Supp. II), as an

2. In *Schoepple v. Schoepple,* supra, the lead opinion was authored by Spaeth, J., and joined by Hoffman, J. Price, J., wrote a concurring opinion in which Watkins, P. J., joined. Cercone, J., wrote a concurring opinion, and Van der Voort, J., concurred in the result. Jacobs, J., dissented. The lead opinion suggested the proper standard should be whether the petitioner was presently unable to pay the costs of litigation. The concurring opinions expressed the fears of three judges that such a standard was too generous and would permit persons to squander their resources and still qualify as indigent under the Rule. The holding proposed in this opinion would conflict with neither the lead opinion nor the concurring opinions.

age-qualified 'needy child . . . who has been deprived of parental support or care by reason of the death, continued absence from the home, or physical or mental incapacity of the parent, and who is living with' any one of several listed relatives." *King v. Smith*, 392 U.S. 309, 313, 88 S.Ct. 2128, 2131, 20 L.Ed.2d 1118 (1968) (footnote omitted).

The AFDC program is administered by the Department of Public Welfare through County Boards of Assistance under the Act of 1967, June 13, P.L. 31, No. 21, art. 4, § 401 et seq.; 62 P.S. § 401 et seq.: "It is hereby declared to be the legislative intent to promote the welfare and happiness of all the people of the Commonwealth, by providing public assistance to all of its needy and distressed; that assistance shall be administered promptly and humanely with due regard for the preservation of family life . . . in such a way and manner as to encourage self-respect, self-dependency and the desire to be a good citizen and useful to society." Thus, the Congress and the legislature of the Commonwealth have attempted to provide the necessities of life to children who are needy and deprived of the support of at least one parent. An applicant for public assistance must establish to the satisfaction of the County Board that he qualifies for assistance under a very elaborate body of regulations, which are designed to qualify for assistance only those persons who cannot otherwise provide the basic essentials of life to their dependents. The County Board approves an application for assistance only after careful examination of an applicant's assets and available income. The approval, therefore, represents an administrative determination by the County Board that the AFDC recipient is needy.

In the instant case, appellant has worked for the same employer for 15 years. His income and the continued absence of his wife from the home qualifies him for assistance under the AFDC program. Thus, there has

been an administrative determination that appellant's children are needy and dependent under the Commonwealth's formula for AFDC eligibility. Appellant's only significant assets are a nine-year-old car, which he must have to travel to work, and various used household furnishings. Appellant testified that his monthly income from welfare and employment total $549.33 [3] and that, due to seasonal fluctuations in earnings, his welfare supplement is adjusted to maintain his income at a constant level. Appellant testified that his monthly expenses total $566.08,[4] which include fixed monthly obligations incurred by appellant's wife. In addition to the $353 in unpaid balances on which appellant pays $98 per month, he owes $820 to other creditors including $300 in unpaid taxes. Review of the testimony indicates that appellant is in very bad financial straits and that the only conceivable way that appellant will be able to provide the necessities of life to his children is to forego litigation.

The clear, unambiguous policy of the United States Congress and the Commonwealth of Pennsylvania is to provide subsistence to needy, dependent children. Further, it is the intent of Rule 1137 to allow persons unable to pay the costs of litigation to proceed without payment of costs. It is illogical for the courts of this Commonwealth to require litigants who receive federal and state funds to purchase necessities for their children, to divert those funds to the payment of court costs to the county or to be barred from the relief which only the courts can give. I would, therefore, hold, that whenever an individual has qualified administratively for welfare payments,

---

3. There is some conflict between the income and expense figures contained in appellant's petition and those to which he testified at the hearing. These discrepancies are relatively minor and, therefore, do not affect the result. At the hearing, appellant testified that he earned $338 per month and received a supplementary grant of $211.33 per month.

4. See note 3, supra. This total is based on monthly expense figures of $70 for rent, $55 for utilities, $178.33 for food, $34.75 for transportation, $130 for babysitting and $98 for loan repayments.

he is *prima facie* indigent within the meaning of Rule 1137. Cf. *Schoepple v. Schoepple,* supra; *Gerlitzki v. Feldser,* supra. Having so qualified, he is presumptively indigent, and the burden shifts to the county to show: 1) that the welfare recipient is in fact not presently eligible for assistance; 2) that the recipient has presently available resources such that payment of cost will not reduce his ability to prove the necessities of life to his needy, dependent children, or 3) that the recipient's financial status is likely to change materially in the foreseeable future such that no hardship will be imposed if waiver of costs is not ordered. Absent such proof, it is an abuse of discretion to order a welfare recipient to pay costs incident to litigation.[5]

I would, therefore, reverse the order of the lower court, and grant appellant's petition to proceed *in forma pauperis.*

---

5. This is not meant to suggest that persons ineligible for welfare assistance bear any greater burden of proof or that the standards for qualification for welfare and for Rule 1137 are identical.